## Hagan v. Commonwealth.

(Decided February 8, 1918.)

## Appeal from Monroe Circuit Court.

1. Criminal Law—Appeal—Review.—Under Criminal Code, section 281, providing that the decisions of the court on challenges to the panel and for cause, or upon motion to set aside an indictment, shall not be subject to exception, the Court of Appeals can not review the action of the trial court in not sustaining defendant's challenge to a juror on account of bias.

2. Continuance—Surprise—Abuse of Discretion.—Where after about twenty witnesses had testified for the Commonwealth, a witness who had not theretofore been called or introduced, testified to a threat made by the defendant against the deceased in the presence of a third party, it was not an abuse of discretion on the part of the trial court to refuse a continuance on the ground that the defendant was surprised by the testimony of the witness and was unable to obtain the presence or deposition of the third party who heard the threat, or to refuse to permit appellant's affidavit as to what such third party would testify, to be read as that party's deposition.

3. Criminal Law—Homicide—Evidence.—Where on a criminal prosecution, appellant testified that the deceased made an improper proposal to her and on being refused, attempted to assault her and for this reason she shot and killed him, it was competent for the Commonwealth to prove specific acts on the part of appellant tending to show that her relations with the deceased were intimate or improper, not for the purpose of establishing her bad character, but for the purpose of showing the improbability of her story concerning the cause of the homicide and the circumstances under which it was committed.

4. Criminal Law—Homicide—Evidence—Conclusion of Witness.—On a prosecution for homicide where the defendant claimed to have shot the deceased to prevent an assault, a witness who had testified that defendant and deceased were in a barn standing by some tobacco that had been bulked down, should not have been permitted to say, "and it looked like they had been laying down on the tobacco," since such statement was not a fact but a mere conclusion of the witness.

5. Homicide—Appeal and Error—Prejudicial Error—Instructions.—In a prosecution for homicide, circumstances considered and held that the giving of an instruction authorizing the conviction of the

defendant as aider and abettor of her husband when there was no evidence connecting her husband with the crime, was prejudicial error.

BAIRD & RICHARDSON, JACKSON & BENHAM, BASIL RICHARDSON, V. H. BAIRD, J. M. JACKSON, B. F. BENHAM and HEBRON LAWRENCE for appellant.

CHARLES H. MORRIS, Attorney General, and D. M. HOWERTON, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

Linda Hagan and her husband, Frank Hagan, were indicted by the grand jury of Monroe county for the murder of James Hagan. The indictment charged the defendants with a conspiracy to murder the deceased and that they committed the murder pursuant to and during the existence of the conspiracy. It was further charged that each was present, aiding, assisting, counseling and encouraging the other to do said shooting but which one fired the fatal shot was to the grand jury unknown. Linda Hagan was tried and convicted of voluntary manslaughter and her punishment fixed at three years' confinement in the State Reformatory. She appeals.

Briefly stated, the evidence for the Commonwealth is as follows: Linda Hagan and her husband, Frank Hagan, and their nine-year-old son, resided in Monroe county near the Metcalfe county line. The deceased, James Hagan, who was a half-brother of Frank Hagan, lived four or five miles distant. Mrs. Paranthia Jackson lived about half a mile from Linda Hagan's home, and between the two places was the home of the Whitleys. The homicide occurred on Sunday afternoon in the month of June, 1916. A short time before the homicide, the deceased passed the homes of Parenthia Jackson and the Whitleys going in the direction of Linda Hagan's home. As soon as he had had time to reach her home, four or five shots were heard in quick succession. After a short interval, other shots were heard. Shortly after the shots were fired, appellant appeared at the home of Mrs. Jackson and called for her husband. At that time she appeared to be excited and was wringing her hands. She informed her husband and those present that James Hagan had attempted to mistreat her and she had killed him. Thereupon her husband, in company with members

of the Jackson and Whitley families, went to appellant's home. The body of the deceased was found in a field near appellant's home. He was lying on his face and had a knife in his hand. Both the knife and his hand were covered with dirt. Near the body of the deceased were some empty cartridges. Mrs. Porter Norman testified that she was at the home of appellant about seven months before the homicide when appellant, referring to the deceased, said: "He is going to die and you and Roxie (wife of deceased) will not know anything about it until he was done dead." Lon Hagan testified that he passed Frank Hagan's home once several years ago and saw Jim Hagan and appellant sitting on the front porch with no one else present. On another occasion he saw appellant riding on a horse behind Jim Hagan with her boy behind her. On another occasion he saw appellant talking low to Jim Hagan at the drug store at Summer Shade. John P. Jenkins testified that about two weeks before the killing the appellant was in his store at Summer Shade and seemed impatient and wanted her husband to come on and go home. While there she walked to the door and looked out. Henry Page testified that on one occasion he saw Jim and Frank Hagan at the edge of the street talking to each other, and that appellant came out of Mr. Jenkins' store and looked toward them and then turned and went back into the house. Tolie Harlin, who lived with Jim Hagan and who appears to be interested in the prosecution, testified as follows: In the year 1912, appellant was visiting at Jim Hagan's and stripping tobacco there. One morning he and appellant, and Jim and his oldest girl went to the barn to milk. When they finished milking, he and one of the girls carried the milk to the house. Jim stopped and said he would have the tobacco out when they got back. Appellant stopped, too, and when he and the girl had gotten half way to the house, he looked back and appellant had gone into the barn. When asked what they were doing, witness said: "Just standing there by some tobacco that had been bulked down, and it looked like they had been laying down on it." On another occasion about the same time while they were all engaged in stripping tobacco, Jim Hagan would reach down to get tobacco and pinch appellant and she would laugh. On still another occasion he saw them in the kitchen and appellant was facing Jim and they were pushing each other's feet around and laughing at

. each other. He had also seen them riding in a buggy together and grinning at each other. He had also seen them hit each other on the shoulder as they would pass. During the year 1916, he saw appellant and Jim Hagan sit down where a plant bed was burning and remain there during the entire morning. During all these years, the relations between appellant and Jim, and Frank and Jim, were always cordial and friendly.

According to appellant's evidence, the homicide occurred under the following circumstances: On the afternoon in question, her son was at his grandfather's and her husband had gone over to Mrs. Jackson's. While she was standing by the window, the decedent came in. She then described the homicide in the following language:

"He spoke to me and asked where Frank was and I said he has gone over to Mrs. Jackson's and he said while he is gone we can have a good time and I says I will not do anything like that and I got up and I told him to get out and he took hold of me and pushed me back to the bed and I reached in the box and got the pistol and commenced shooting him. He said he was going to kill me if I did not submit to him. I begun shooting fast as I could and he went out in the hall and I followed him to the door and shot as fast as I could and he got out and I thought he was coming back on me and I run back and reloaded. I do not know how nor where I got them. I shot again and followed him to the yard fence." The pistol which she used was kept in a rack over the door. In the same box were some cartridges. How many times she shot or hit him she did not know. When he was in the house, deceased said that he would kill her and reached his hand in his pocket. She followed him to the door and he turned back on her. When he did that, she ran out and reloaded the pistol and began shooting again. When she began shooting again, deceased was out in the front yard. When Frank returned from Mrs. Jackson's, he took the pistol for fear that she might hurt herself, removed the shells and went toward the place where the deceased lay. Appellant while admitting that her relations with the deceased were always cordial and friendly, denied that she was ever guilty of any intimacy with him, or any other acts of impropriety. It was further shown by her neighbors that she enjoyed a good reputation for chastity and morality.

(1). The first ground urged for a reversal is the error of the court in permitting Homer Murphy, who was challenged on account of bias, to sit as a juror. Since Criminal Code, section 281, provides that the decisions of the court on challenges to the panel and for cause or upon motion to set aside an indictment, shall not be subject to exception, we can not review the action of the trial court. Curtis v. Commonwealth, 110 Ky. 845, 62 S. W. 886; Lawson v. Commonwealth, 152 Ky. 113, 153 S. W. 56.

(2). When Mrs. Norman testified to the alleged threat made by appellant, appellant asked for a continuance on the ground of surprise, and filed in support thereof, her affidavit and the affidavit of John Hagan, the husband of Mrs. Nancy Hagan, in whose presence the witness claims the threat was made. From these affidavits it appears that Mrs. Norman was called as a witness after about twenty odd witnesses had testified for the Commonwealth and that she had never been introduced or called as a witness before that time; that appellant did not discover and had no means of discovering that Mrs. Norman would give the testimony in question and did not know or have any means of knowing that Nancy Hagan would be needed as a witness until Mrs. Norman so testified. It further appeared from the affidavits that Nancy Hagan was an invalid, lived in Metcalfe county, that the ground was covered with snow, and that it would be impossible to have her present at that term of court or to take her deposition during the trial. It was further alleged that appellant could prove by Nancy Hagan that she was not present when the alleged threat was made by appellant and that the conversation detailed by Mrs. Norman never occurred at any time or place. This is not a case where the defendant was surprised by testimony contradictory of that theretofore given by a witness or different from that which the witness had led the defendant or counsel to believe that she would give. It is simply a case where a new witness was introduced and that witness gave damaging testimony that was not expected by the defendant. While the trial court might with propriety have granted the continuance or permitted the affidavit to be read as the deposition of Nancy Hagan, we are not prepared to announce the rule that the court's failure to do so was an abuse of discretion. To so hold would require the Commonwealth always to dis-

close its testimony in advance and put it in the power of every defendant upon its failure to do so, to obtain a continuance on the sole ground that a portion of the testimony was not expected or anticipated by him or his counsel.

(3). In as much as appellant testified that the deceased first made improper proposals' to her and upon being refused, attempted to assault her and for this reason she shot and killed deceased, it was competent for the Commonwealth to prove specific acts on the part of appellant tending to show that her relations with the deceased were intimate or improper, not for the purpose, of course, of establishing her bad character, but for the purpose of showing the improbability of her story concerning the cause of the homicide and the circumstances under which it was committed. However, we think the court erred in permitting the witness, Tolie Harlin, after describing the occurrence in the barn, and the fact that the tobacco was bulked down, to say, "and it looked like they had been laying back on the tobacco." While the witness had the right to describe the appearance of the tobacco, it was not competent for him to state his opinion or conclusion to the jury. That this statement was very damaging and prejudicial to appellant there can be no doubt, for if she and the deceased had been lying back on the tobacco, this was a strong circumstance tending to show that their relations were improper.

In instructing the jury both on murder and manslaughter, the court authorized a conviction of appellant if she shot and killed the deceased, or her husband shot and killed him and she was present aiding and abetting him. It is admitted by the Commonwealth that there was no evidence tending to show that appellant's husband fired any of the shots that killed the deceased, but argued that in as much as appellant herself admitted that she fired the fatal shot, that part of the instruction authorizing her conviction as the aider and abettor of her husband, comes under the rule laid down in the case of Caudill v. Commonwealth, 155 Ky. 578, 159 S. W. 1149. In that case, however, not only Caudill but all the witnesses for the Commonwealth stated that he fired the fatal shot and that the person he was charged with aiding and abetting did not shoot at all. In the case under consideration, appellant was the only eyewitness and the Commonwealth introduced certain circumstances to over-

come the effect of her testimony. Notwithstanding the fact that there was absolutely no evidence connecting her husband with the homicide, the court saw fit to give an instruction authorizing appellant's conviction as aider and abettor of her husband. In view of the fact that the jury had the right to disbelieve appellant's account of the homicide, and to infer from the court's action that there was some evidence on which to submit the question whether her husband was guilty as principal and she as aider and abettor, it is impossible for us to say whether the jury found her guilty as principal, which it was properly authorized to do, or guilty as aider and abettor, which it was improperly authorized to do. We therefore conclude that the giving of the instructions complained of was prejudicial error.

Judgment reversed and cause remanded for a new trial consistent with this opinion.

Whole court sitting.