## Napier v. Commonwealth.

October 21, 1947.

Ray C. Lewis, Judge.

76

Eldon S. Dummit, Attorney General, and Guy H. Herdman, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER
—Reversing.

Wilson Feltner's body was struck and run over by a train at or near a public crossing in Laurel County between 4:25 and 4:30 o'clock a. m., June 7, 1945. The body was found on the right of way approximately one-half hour later. Because of the circumstances, which hereinafter will be recited, appellant, John Pennington, Sewell McWhorter, Roy B. Mullins, and Walton Watkins were indicted for Feltner's murder. Appellant was tried separately, found guilty of manslaughter, and sentenced to serve two years in the State Reformatory.

He seeks reversal of the judgment, contending that the Court erred (1) in overruling his motion for a peremptory instruction; (2) in permitting incompetent evidence to be introduced by the Commonwealth; and (3) in instructing the jury.

The Commonwealth relies on circumstantial evidence alone to establish that Feltner was killed by a criminal agency and thereafter dragged to the tracks of the railroad where his body was mangled by the train, and that the crime was committed by appellant and the alleged accomplices named in the indictment. The Commonwealth's evidence shows that appellant, Frances Bonera, Mae Gentry, Earl Hensley, Ruby Ward, and Margaret Ward left a skating rink about 10:30 o'clock on the night of June 6, and after driving to various places parted company at about 1:30 o'clock on the morning of June 7. Hensley was driving the automobile, and let Napier out at the Pittsburg crossing (which is the crossing near which Feltner.'s body was found). In departing from Hensley, appellant stated that he was going to the home of John McCoy, which is about three hundred feet from the crossing. McCoy testified that appellant, in company with Feltner, arrived at his home between 3:00 and 4:00 o'clock in the morning. Napier asked McCoy to cash a check for him; McCoy refused, and Feltner asked him if he could come inside the house to talk to him. Napier objected to Feltner's entering the house, whereupon Feltner said, ''You ain't no law and you know you ain't. * * * You ain't got no right to arrest me;'' to which Napier replied, ''Well, I will show you, you done talked too damn much now.'' Feltner and Napier then departed, but Napier returned within a few minutes with another check and asked to have it cashed; McCoy refused and Napier left. On Napier's last visit McCoy saw a flashlight in Napier's front pocket and a blackjack in his hip pocket. When the Sheriff and other officers arrived at the scene shortly after the body was discovered, they found Feltner's hat about sixty-six feet from the railroad tracks; near the hat were two spots of blood and some hair which was introduced in evidence and transmitted to this Court together with a sample from the head of the deceased. The exhibits appear to be identical. The Coroner testified that there were blood spots and one bloody

fingerprint on the hat at the time he first inspected it. Four witnesses, including the Coroner and Sheriff, testified that they saw signs and tracks from the place where the hat was found, leading across the railroad platform to and upon the railroad tracks, indicating that a heavy object had been dragged by more than one person. The body was found one hundred twelve feet north of the place where the tracks of the heavy object ended: the train which mangled the body was traveling in a northerly direction. A few nights after the deceased met his death, Napier called at the home of McCoy, reminded him that Feltner had been killed and stated to him: ''John, nobody knows I was with that man that morning except you and Grace and Pansy, and I don't want to get mixed up in this no way, and whatever you do don't say anything about me being with him, me and him was drinking and we come up here and nobody knows anything about it.''

McCoy further testified: ''He (Napier) said after they got back to town Mr. Feltner claimed he had lost some money and he said 'You know I did not get it off of him, and we had a little argument and after the argument I went down to the end of Willie's, down the creek that goes to the graveyard and went over the railroad and hit the highway, and come on and went home.' ''

Three or four days after the body was found a warrant was obtained for appellant's arrest. The warrant was placed in the hands of some deputy sheriffs who went to Napier's house to arrest him. When they arrived within approximately three hundred yards of the house they observed two men running from the house, and one of them looked like Napier; at any rate, Napier was not seen thereafter until he was arrested in Baltimore, Maryland, on some other charge. The Maryland officers advised the Kentucky officers of Napier's apprehension, and two deputy sheriffs drove to Baltimore to return him to Kentucky. On the return journey they stopped in Madisonville, Virginia, where Deputy Sheriff Bruner entered a cafe to purchase some sandwiches. Leaving his pistol on the seat of the car, Deputy Steele raised the hood of the automobile to attempt to discover the cause of one of the cylinders miss-

ing. Napier, although handcuffed, seized the pistol and fled. The officers pursued but could not catch him, and he was not seen again until he was arrested by Highway Patrol Captain John Black, in Pineville, Kentucky, where he was registered in a hotel under an assumed name. In his room Captain Black seized a pistol which appellant admitted was the one he took from Steele. This arrest occurred in April or May of 1946, approximately eleven months after the death of Feltner. Appellant denied all the testimony as to his actions after 10:00 o'clock on the night of June 6 and the morning of June 7. He was corroborated in his denials by three or four witnesses; but this testimony merely raised an issue triable by the jury.

Where the evidence for the Commonwealth, although circumstantial, is such as to reasonably exclude every hypothesis of innocence, the court should submit the case to the jury and permit them to determine whether the evidence for the defendant is sufficient to overcome the inference of guilt raised by the evidence introduced by the Commonwealth. Watson v. Commonwealth, 298 Ky. 350, 182 S. W. 2d 901. The evidence concerning the hat, blood, and hair of the deceased at a point sixty-six feet distant from the railroad, and the tracks indicating the body was dragged to the railroad, was sufficient for the jury to conclude that Feltner came to his death by a criminal agency. Thus, by circumstantial evidence, the Commonwealth established the corpus delicti.

We think the evidence connecting appellant with the crime is stronger even than the evidence establishing that a crime was committed. Appellant was placed with Feltner near the scene of the crime but a few minutes before the train passed over the body. At that time he had a flashlight and a blackjack, and previously had engaged in an argument with the deceased. If McCoy's testimony can be believed (and this was a question for the jury), appellant admitted that Feltner virtually had accused him of stealing money from him, and he had an argument with him about that. He later attempted to still the voice of possible witnesses against him; fled from arrest; and escaped after his first arrest, at which time he disarmed his guard. Flight and

escape after being charged with a crime is evidence of the defendant's guilt. Noah v. Commonwealth, 273 Ky. 272, 116 S. W. 2d 315, and cases therein cited. Eleven months after the crime he attempted to hide his identity by registering in a hotel in Pineville under an assumed name. He testified that he stole the pistol for the purpose of pawning it to obtain money; but when he was arrested several months thereafter he had the pistol in his possession. All of the circumstances we have related point to the fact that a homicide was committed, and that appellant was the perpetrator of it. We have no difficulty in concluding that the Court properly overruled appellant's motion for a directed verdict of acquittal.

Appellant objects to certain testimony introduced by the Commonwealth in rebuttal. The County Attorney testified that Grace McCoy, a witness for appellant, contradicted the testimony she gave on the trial when she testified before the Grand Jury. The objection to this testimony is that it is not the best evidence of the facts related by the witness, since a stenographer recorded in shorthand and transcribed the testimony heard by the Grand Jury, and the Commonwealth failed to show that that report was not in existence at the time the County Attorney testified. The best evidence rule embraces within its application every fact or issue which may be in controversy; but in practical application, it applies almost exclusively to documentary evidence. The rule is that a party to an action must introduce the most authentic evidence of which the case is susceptible and which is within the power of the party to produce. But a stenographic report, unless required by law to be made a part of a public record, cannot be deemed to be more authentic than the memory of one who heard the facts related in the report. 20 Am. Jur., Sec. 405, p. 366. Other objections to the evidence concern the Court's failure to admonish the jury in respect to it, and failure of a witness to fix a time to which he testified as to the reputation of certain defense witnesses. Since the judgment must be reversed because of the instructions, it is unnecessary for us to determine the prejudicial effect of these errors. On the next trial the Court will admonish the jury in respect to testimony concerning the character of witnesses, and

will require the witnesses to fix the time to which the reputation they testify about refers.

Objection was made to the introduction in evidence of the clothing and hair of the deceased; and appellant now insists that the Court erred in overruling his objection to the introduction of these exhibits. The most substantial circumstance in proof of the corpus delicti was that the bloody hat and hair were lying sixty-six feet from the place the body was struck by the train; and the circumstance next to that in importance was the evidence that a heavy object, presumably the body of deceased, was dragged from that place to the railroad right of way. The clothes of the deceased were not transmitted to this Court as a part of the record, but it is possible that they gave mute evidence that Feltner's body was the object dragged from the place the alleged crime was committed. We think the introduction of these exhibits was properly allowed.

The first complaint in respect to the instructions is that the Court erred in instructing on wilful murder, whereas it is claimed the indictment charged a conspiracy. We deem it unnecessary to discuss the question of the propriety of a trial court in instructing the jury on murder where the indictment merely charged the accused with conspiracy, because in this case the premise alleged is erroneous. The indictment did not charge conspiracy, but charged the defendant and his alleged accomplices with murder, although in describing the manner in which the crime was committed the indictment did allege a conspiracy. But murder is murder, whether or not it be committed in pursuance of a conspiracy. The next complaint is that the Court erred in instructing on voluntary manslaughter, because there was no evidence to sustain this charge. There was evidence of a scuffle on the ground near the blood spots and the place where the hat was found. Where the evidence relied upon by the Commonwealth is purely circumstantial, it is the duty of the Court to instruct on voluntary manslaughter where there is evidence that a struggle occurred. Fletcher v. Commonwealth, 239 Ky. 506, 39 S. W. 2d 972, 977, and cases therein cited.

But the third complaint about the instructions is more serious and must be sustained. Despite the fact

that there was no evidence whatever connecting John Pennington, Sewell McWhorter, Roy B. Mullins, or Walton Watkins with the crime, the Court gave an instruction authorizing appellant's conviction as aider and abettor of all or either of them. We invariably have held that the giving of such an instruction under such circumstances is reversible error. In Hagan v. Commonwealth, 179 Ky. 201, 200 S. W. 336, 338, we said: "Notwithstanding the fact that there was absolutely no evidence connecting her husband with the homicide, the court saw fit to give an instruction authorizing appellant's conviction as aider and abettor of her husband. In view of the fact that the jury had the right to disbelieve appellant's account of the homicide, and to infer from the court's action that there was some evidence on which to submit the question whether her husband was guilty as principal and she as aider and abettor, it is impossible for us to say whether the jury found her guilty as principal, which it was properly authorized to do, or guilty as aider and abettor, which it was improperly authorized to do. We therefore conclude that the giving of the instructions complained of was prejudicial error."

See also Hobbs v. Commonwealth, 306 Ky. 66, 206 S. W. 2d No. 1. A trial court, especially a regular circuit judge, wields a tremendous influence on the minds of jurors; and it is not unusual for a jury to conclude that "technical" rules of evidence tend to suppress "facts" which in their opinion should be introduced in evidence; and when the court instructs them upon an issue concerning which no evidence was introduced, jurors sometimes gather the impression that the court is attempting to point out the "true facts" in the unauthorized instruction. Oftentimes this results in the jury's "reading between the lines" of the evidence and arriving at an erroneous conclusion. Such being true, the court meticulously should follow the evidence in instructing the jury.

Because the Court erred in the giving of this instruction, the judgment must be, and hereby is, reversed, with directions that appellant be granted a new trial to be conducted in conformity with this opinion.